The PEOPLE of the State of
Colorado, Complainant

v.

Debra Ann SWEETMAN, Respondent.

No. 07PDJ031.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

Nov. 3, 2008.

## OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19

### I. *ISSUE AND SUMMARY*

 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury. Suspension is generally appropriate when a lawyer engages in a pattern of neglect and causes injury or potential injury. Respondent, in four separate client matters, neglected their cases, failed to adequately communicate with them, and knowingly converted funds belonging to them. Is disbarment the appropriate sanction in the absence of evidence in mitigation?

Respondent initially failed to participate in these proceedings, later filed an answer after the PDJ agreed to set aside a default judgment, and then stopped participating in these proceedings. Respondent has been placed on disability inactive status. Nevertheless, the Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 1.3, Colo. RPC 1.4(a), Colo. RPC 1.7(a), Colo. RPC 1.16(d), and Colo. RPC 8.4(c). Without sufficient evidence in mitigation, the appropriate discipline for knowing conversion of client funds is disbarment.

*SANCTION IMPOSED:* **ATTORNEY DISBARRED**

### II. *PROCEDURAL HISTORY AND BACKGROUND*

On May 18, 2007, the People filed a Complaint that contained sixteen separate claims related to four separate client matters. Respondent initially failed to participate in these proceedings and the People filed a motion for default on July 26, 2007. On August 28, 2007, the PDJ granted the People's motion for default and scheduled the matter for a Sanctions Hearing to be held on December 13, 2007.

On December 10, 2007, Respondent filed a motion to set aside the order of default. The PDJ held a Status Conference and granted

the motion on December 11, 2007. Respondent thereafter filed her answer to the complaint on December 31, 2007, and an amended answer on January 14, 2008.

On January 15, 2008, the PDJ held an At-Issue Conference. Respondent advised the PDJ that she would need approximately six weeks to recover from an upcoming surgery scheduled for March 19, 2008. Accordingly, the PDJ scheduled the case for a three-day Hearing to commence on June 10, 2008.

On March 31, 2008, the People filed a request for sanctions after Respondent failed to attend her deposition scheduled before her surgery. The PDJ granted the People's motion for sanctions on May 8, 2008. On June 10, 2008, the Hearing Board heard testimony and argument from the People. Respondent failed to appear for the Hearing.

### III *FINDINGS OF MATERIAL FACT*

The Hearing Board finds the following facts by clear and convincing evidence.

Respondent admitted in her answer that she took and subscribed the Oath of Admission and gained admission to the Bar on November 1, 1995. She is registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 15265, and is therefore subject to the jurisdiction of the PDJ in these disciplinary proceedings pursuant to C.R.C.P. 251.1(b). Respondent's registered business address is 417 West Mountain Avenue, Fort Collins, Colorado 80521.

#### *Gibson Statement* [1]

James "Hoot" Gibson, a sales marketing director, hired Respondent on or about July 19, 2005. Mr. Gibson hired Respondent to contact his creditors in order to settle his debts and/or establish payment plans to pay off his creditors and to represent him in a pending collection matter in Eagle County, Colorado. Respondent filed an answer on Mr. Gibson's behalf in *Continental Collection Agency v. Hoot Gibson,* on August 3, 2005.

---

1. Although the Hearing Board heard testimony from this witness, the PDJ ruled that his testimony would only be considered on the issue of sanctions, because the PDJ had no jurisdiction to issue an oath to this witness who appeared by telephone from Canada. The PDJ nevertheless accepted his statement to the Hearing Board as provided in C.R.C.P. 251.22(c)(3).

Mr. Gibson signed a written fee agreement that provided for an hourly rate of $170.00 and paid Respondent $300.00 in cash toward an $850.00 retainer fee.[2] He subsequently attempted to contact Respondent by telephone several times regarding his case, but she did not return his calls. On October 12, 2005, Mr. Gibson sent Respondent an e-mail message seeking advice from her after he received a call from "Account Brokers" regarding one of his debts.[3] Mr. Gibson sent this e-mail message to the wrong address.

On October 13, 2005, Mr. Gibson sent Respondent an e-mail message, this time to the correct e-mail address, attaching his earlier e-mail message, and stating that he was still waiting to hear from her.[4] On October 14, 2005, Mr. Gibson called Respondent's office and left a message with her staff that he intended to file a grievance against her unless she responded to his inquires.

On October 14, 2005, Respondent sent Mr. Gibson an e-mail message and terminated the representation.[5] She disputed his claims that he had repeatedly contacted her without receiving a response. Nevertheless, Respondent agreed to provide an accounting of her services and refund any remaining retainer fees. Respondent failed to provide such an accounting or return any unearned fees despite the fact Mr. Gibson sent her three additional e-mail messages expressing his concern about her failure to act on his behalf and failure to provide an accounting.[6]

Finally, Mr. Gibson stated to the Hearing Board that he had a good view of the legal profession prior to his experience with Respondent. He believes that his credit rating suffered as a result of Respondent's failure to act on his behalf, but also acknowledged that his credit had been poor before hiring her.

*Boyce Matter*

Holly Ann Boyce, a licensed hair stylist, hired Respondent to complete a "simple" Chapter 7 bankruptcy for her on March 4, 2005.[7] The fee agreement called for a flat fee of $600.00 and a $200.00 filing fee. Ms. Boyce expressed a need to quickly address her financial troubles due to the pending foreclosure of her home and pressure from other unpaid creditors. She understood Respondent would file the bankruptcy within the week upon receiving necessary documentation from Ms. Boyce.

Ms. Boyce immediately provided Respondent with the paperwork necessary to file the bankruptcy and paid her $800.00, which she borrowed from her father. However, Ms. Boyce continued to receive harassing phone calls from creditors because Respondent had not filed the bankruptcy as of mid-April. She discovered this fact after she contacted the bankruptcy trustee who notified her that Respondent had not filed the case.

Ms. Boyce attempted to contact Respondent on numerous occasions to discuss her case. Respondent finally filed the bankruptcy petition in mid-May 2005, but the petition was incomplete. The bankruptcy court issued a standard notice of deficiency because Respondent had failed to file the required statement of financial affairs and/or schedules. Ms. Boyce received the notice of deficiency, called Respondent's office, and voiced her concern to a member of Respondent's staff. Respondent returned the call from Ms. Boyce and "fired" her. Respondent told Ms. Boyce that she no longer trusted Ms. Boyce because Ms. Boyce had contacted the bankruptcy court behind her back.

Respondent continued to file pleadings before the bankruptcy court granted her motion to withdraw. On or about July 1, 2005, Ms. Boyce sent a letter to Respondent and requested that she cease all work on her case

---

**2.** *See* Exhibit 1, "Attorney/Client Agreement" dated July 14, 2005; and Exhibit 2, copy of check in the amount of $550.00.

**3.** *See* Exhibit 3, e-mail dated October 12, 2005.

**4.** *See* Exhibit 4, e-mail dated October 13, 2005.

**5.** *See* Exhibit 5, e-mail dated October 14, 2005.

**6.** *See* Exhibit 6, e-mail dated October 14, 2005; Exhibit 7, e-mail dated November 7, 2005; and Exhibit 8, e-mail dated November 18, 2005.

**7.** *See* Exhibit 9, "Attorney /Client Agreement" dated March 4, 2005.

and return all of her documents by July 7, 2005.[8] Respondent initially "got nasty" and refused to return Ms. Boyce's paperwork, but relented when new counsel contacted Respondent.

Ms. Boyce contacted the bankruptcy trustee who advised her to consult with another lawyer, Robert Rand. Mr. Rand agreed to finish the bankruptcy case for $500.00. He filed an amended petition and Ms. Boyce received a discharge on September 28, 2005.

Ms. Boyce suffered significant stress when Respondent failed to adequately prosecute her bankruptcy case. Respondent never refunded unearned fees to Ms. Boyce. Ms. Boyce also had to pay additional attorney fees in the amount of $500.00 to complete the bankruptcy. In the meantime, Ms. Boyce had to deal with creditors and a troublesome divorce while working, attending community college, and caring for a five year-old daughter. This experience has caused Ms. Boyce to be "leery" of lawyers, but she also acknowledges the good work the bankruptcy trustee and her new lawyer have done on her behalf.

### Dominguez Matter

Amy Dominguez is a high school graduate and a single mother with four young boys. She hired Respondent to complete a Chapter 7 bankruptcy for her on January 27, 2005.[9] The fee agreement called for a flat fee of $600.00 and a $209.00 filing fee. Ms. Dominguez paid Respondent $600.00, which she borrowed from her mother, in February 2005.[10] She agreed to pay the filing fee at their next meeting.

Ms. Dominguez expressed a need to quickly address her financial troubles due in part to pending legal actions against her husband whom she was in the process of divorcing.[11] She had already lost her car and home, her wages had been garnished, and she asked Respondent to help her avoid losing "everything else." Ms. Dominguez provided Respondent with all of her original documents. She met with Respondent a couple of times, but later canceled a meeting to pay the $209.00 filing fee when her son became ill. Thereafter, Ms. Dominguez was unable to reach Respondent even though she called her office over a dozen times. Respondent failed to return any of Ms. Dominguez's calls.

On or about November 12, 2006, after filing a complaint with the People, Ms. Dominguez sent Respondent a certified letter documenting her numerous attempts to reach Respondent, her displeasure with Respondent's failure to take any action on her behalf, and demanding her file and a refund of fees.[12] Respondent failed to answer Ms. Dominguez's letter, refund unearned fees, or return her original documents.

Respondent never filed Ms. Dominguez's bankruptcy petition. Ms. Dominguez ultimately lost her job in part because of the time she missed from work while trying to deal with her financial problems on her own. Her creditors are still seeking payment. She lost her home and now lives with her parents. Although Ms. Dominguez is working, she expects that her paychecks will again be garnished. She also contacted legal aid for assistance with her bankruptcy, but they could not provide assistance because counsel still represented her.

Ms. Dominguez distrusts lawyers because of this experience. As a result, she has not sought additional legal counsel for her ongoing financial issues.

### Southcotte Matter

Susan Southcotte is a high school graduate employed by Wal–Mart. She hired Respondent for a dissolution matter, on June 8,

---

8. *See* Exhibit 10, letter dated July 1, 2005.

9. *See* Exhibit 11, "Attorney /Client Agreement" dated January 27, 2005.

10. *See* Exhibit 12, copy of receipt for $600.00.

11. At that time, Ms. Dominguez's husband had been criminally prosecuted and civilly sued for injuries to others as a result of his involvement in

a traffic accident. Mr. Dominguez had also been sentenced to prison in the criminal matter. They divorced on March 22, 2006.

12. *See* Exhibit 13, letter dated November 12, 2006.

2005.[13] Shortly thereafter, she paid Respondent a $1,899.00 retainer fee, which Ms. Southcotte understood would fully cover the cost of the uncontested dissolution matter.[14]

Respondent originally agreed to only represent Ms. Southcotte in the dissolution matter. However, on or about June 22, 2005, Respondent and her husband, Stoney Southcotte, both signed a second fee agreement for the purpose of performing and "amicable dissolution."[15] This agreement also quoted a retainer fee of $1,899.00. Respondent advised the Southcottes that there would probably be enough retainer funds left over to cover fees for Respondent to represent Mr. Southcotte in a bankruptcy case. Thereafter, Mr. Southcotte signed a fee agreement with Respondent to file a Chapter 7 Bankruptcy for a flat fee of $600.00.[16] The Southcottes only provided the original $1,899.00 retainer fee and not any additional funds to Respondent.

Following their meeting with Respondent on June 22, 2005, Ms. Southcotte discovered Respondent had not filed the petition in the dissolution matter. Ms. Southcotte made several appointments to meet with Respondent, but Respondent missed approximately six appointments with the Southcottes. Respondent's secretary once advised Ms. Southcotte that Respondent missed a meeting because her mother needed care. In another attempt to reach Respondent, Ms. Southcotte went to Respondent's office and left a note on her door when she found no one present. The note detailed Ms. Southcotte's numerous efforts to contact Respondent about her case.[17]

After Respondent failed to respond to her, Ms. Southcotte filed her own *pro se* dissolution petition.[18] She also sent Respondent a certified letter, terminated her services, and requested a full refund on or about August 4, 2005.[19] Ms. Southcotte later received a letter dated July 27, 2005, in which Respondent explained that she had tried to file the petition, but that the clerk's office did not have it. She also thanked Ms. Southcotte for "rescheduling" her appointment and referenced a settlement agreement, which Respondent said she would send to Ms. Southcotte after returning to her office.[20] Ms. Southcotte testified that she received this letter after sending her certified letter to Respondent.

## IV. CONCLUSIONS OF LAW

### Neglect and Failure to Communicate— Colo. RPC 1.3 and Colo. RPC 1.4

Colo. RPC 1.3 provides that a lawyer shall act with reasonable diligence and promptness in representing a client and the lawyer shall not neglect a legal matter entrusted to the lawyer. Colo. RPC 1.4(a) provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

■ The Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 1.3 and Colo. RPC 1.4(a) in the Boyce, Dominguez, and Southcotte matters. She neglected the Boyce matter by failing to promptly file the bankruptcy petition. Respondent neglected the Dominguez matter by failing to prepare and file the bankruptcy petition. Finally, she neglected the Southcotte matter by failing to file the dissolution of marriage petition. In each of these client

---

13. *See* Exhibit 14, "Attorney /Client Agreement" dated June 8, 2005.

14. *See* Exhibit 15, copy of check for $1899.99.

15. *See* Exhibit 16, "Attorney/Client Agreement" dated June 22, 2005.

16. *See* Exhibit 17, "Attorney/Client Agreement" dated June 22, 2005.

17. *See* Exhibit 19, note left by Susan Southcotte.

18. *See* Exhibit 21, certified copy of case number 05DR960.

19. *See* Exhibit 23, letter dated August 4, 2005.

20. Mr. Southcotte, unlike his former wife, recalled that Respondent had prepared a settlement agreement for them during their first meeting.

matters, Respondent failed to communicate with her clients by failing to respond to their requests for information concerning their cases.

### Conflict of Interest—Colo. RPC 1.7(a)

Colo. RPC 1.7(a) provides that a lawyer shall not represent a client if the representation of that client may be directly adverse to another client unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and each client consents after consultation.

█ The Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 1.7(a) in the Southcotte matter. Respondent agreed to represent the Southcottes in their dissolution matter and also represent Stoney Southcotte in his bankruptcy matter. However, Respondent failed to advise the Southcottes of the potential conflicts and failed to obtain their consent before representing them in both these matters.

### Protecting Client's Interests Upon Termination—Colo. RPC 1.16(d)

Colo. RPC 1.16(d) provides that upon the termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client and surrendering papers and property to which the client is entitled.

█ The Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 1.16(d) in the Dominguez and Southcotte matters. Respondent failed to return Ms. Dominguez's documents and failed to return any portion of the fees in the Dominguez or Southcotte matters.

### Knowing Conversion—Colo. RPC 8.4(c)

Colo. RPC 8.4(c) prohibits a lawyer from engaging in conduct involving dishonesty, deceit, misrepresentation or fraud.

█ The Hearing Board finds clear and convincing evidence that Respondent violated

Colo. RPC 8.4(c) in the Dominguez and Southcotte matters. Respondent accepted $600.00 in the Dominguez matter and thereafter failed to prepare and file bankruptcy pleadings. Thus, Ms. Dominguez received no benefit from any work completed by Respondent. Nevertheless, Respondent failed to return these unearned funds despite the fact that Ms. Dominguez requested them.

Similarly, in the Southcotte matter, although Respondent may have prepared documents, she never filed them. Thus, the Southcottes also received no benefit from any work completed by Respondent. Again, Respondent failed to return these unearned funds despite the fact that Ms. Southcotte requested them.

In each of these client matters, Respondent failed to return funds, which she knows belong to her clients and which she knows they have not authorized her to exercise dominion over.

## V. SANCTIONS

█ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. *In re Roose*, 69 P.3d 43, 46–47 (Colo.2003).

### Analysis Under the ABA Standards

The Hearing Board considered the following standards in addressing the appropriate sanction in this case. ABA *Standard* 4.11 provides that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. ABA *Standard* 4.42(b) provides that suspension is generally appropriate when a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

However, before imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first

consider the following factors to determine whether the presumed sanction is appropriate:

- The duty violated;
- The lawyer's mental state;
- The actual or potential injury caused by the misconduct; and
- The existence of aggravating or mitigating factors.

## A. THE DUTY VIOLATED

The Hearing Board finds that Respondent primarily violated duties owed to her clients. She neglected her duty to act with diligence, failed to adequately communicate with her clients, and knowingly converted their funds. These duties arise out of the nature of the basic relationship between the lawyer and the client. She also knowingly converted their funds.

In addition to violating duties owed to her clients, Respondent's conduct breaches the public and professional trust in lawyers. *See In re DeRose*, 55 P.3d 126, 131 (Colo.2002) (*paraphrasing In re Pautler*, 47 P.3d 1175, 1178 (Colo.2002)).

## B. THE LAWYER'S MENTAL STATE

The Hearing Board finds that Respondent acted knowingly when she converted funds belonging to her clients.[21] Respondent also acted with awareness when she neglected client matters over several months.

## C. THE ACTUAL OR POTENTIAL INJURY

The Hearing Board finds that Respondent caused serious emotional and financial injury to her clients when she neglected their matters, failed to adequately communicate with them, and knowingly converted their funds. Each of these former clients testified that their experiences with Respondent have left them leery of the legal profession.

## D. AGGRAVATING AND MITIGATING FACTORS

### 1. MATTERS IN AGGRAVATION, ABA *STANDARD* 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction to impose. Aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline imposed. ABA Standard 9.21.

**Dishonest or Selfish Motive—9.22(b)**

Respondent knowingly converted funds from her clients and made no effort to return these funds. This conduct demonstrates a dishonest and selfish motive.

**Pattern of Misconduct/Multiple Offenses—9.22(c) & (d)**

Respondent engaged in a pattern of misconduct and multiple offenses when she violated one or more of the following rules of professional conduct, Colo. RPC 1.3, 1.4(a), 1.7(a), 1.15(b), 1.16(d), and 8.4(c), in the Boyce, Dominguez and Southcotte matters.

**Refusal to Acknowledge the Wrongful Nature of Conduct—9.22(g)**

Respondent failed to participate in these proceedings and failed to acknowledge that she engaged in any wrongdoing against her former clients.

**Vulnerability of Victims—9.22(h)**

Ms. Dominguez, Ms. Southcotte, and Ms. Boyce were all vulnerable clients who desperately needed legal assistance from Respondent at the time they hired her. Respondent knew their plight and still neglected their matters and failed to adequately communicate with them. When these clients attempted to find out why

---

**21.** "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result. ABA *Standards,* Definitions.

she had failed to perform the work she had agreed to complete, Respondent simply stepped away from her responsibilities and left her clients to deal with their legal matters on their own. Each of Respondent's clients, high school graduates, were experiencing emotional trauma at the time they placed their trust in Respondent.

### Substantial Experience with the Law—9.22(i)

Respondent was admitted to the Colorado Bar in 1985. Absent evidence to the contrary, the Hearing Board therefore finds Respondent has substantial experience with the law.

### Indifference to Making Restitution—9.22(j)

Respondent failed to make any effort to return money belonging to her clients.

### 2. MATTERS IN MITIGATION, ABA STANDARD 9.3

The Hearing Board considered evidence of the following mitigating circumstances in deciding what sanction to impose. Mitigating circumstances are any considerations, or factors that may justify a reduction in the degree of discipline imposed. ABA *Standard* 9.31.

### Absence of a Prior Disciplinary Record—9.32(a)

Respondent received her license to practice law in the State of Colorado November 1, 1995 and has no prior disciplinary record.

### Personal or Emotional Problems—9.32(c)

Although Respondent failed to present any evidence to the Hearing Board related to personal or emotional problems, the PDJ takes notice of the fact that he transferred Respondent to disability inactive status on April 10, 2007.[22] While this circumstance falls short of proving Respondent suffered from a mental disability at the time of the events presented in this case, this undisputed fact *may* shed light on Respondent's misconduct. *See People v. Lujan,* 890 P.2d 109–112 (Colo.1995) and ABA *Standard* 9.32(h).

### Analysis Under Case Law [23]

■ Knowing conversion "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996) (*quoting In re Noonan,* 102 N.J. 157, 506 A.2d 722, 723 (1986)). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. Furthermore, the ABA *Standard* 4.1 states disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to the client.

The Colorado Supreme Court has indicated that lawyers are "almost invariably disbarred" for knowing misappropriation of client funds. *Id.* at 11; *People v. McGrath,* 780 P.2d 492, 493 (Colo.1989) ("the Court would not hesitate to enter an order of disbarment if there was no doubt that the attorney engaged in knowing conversion of his client's funds"); *In re Thompson,* 991 P.2d at 823; *People v. Lavenhar,* 934 P.2d 1355 (Colo.1997); *People v. Lefly,* 902 P.2d 361 (Colo.1995); *People v. Young,* 864 P.2d 563 (Colo.1993) (conversion of clients' funds war-

---

**22.** C.R.C.P. 251.23(c) allows the PDJ to take whatever action necessary when it appears a respondent is so incapacitated as to be unable to proffer a defense. Here, Respondent did not appear and offer proof of mitigation. However, as one of the Hearing Board members noted, the People alleged that Respondent was disabled in their Complaint. Disability Proceedings are confidential as provided in C.R.C.P. 251.23(c).

**23.** While neglect, failure to communicate, and representing two clients without taking precautions to assure that the client has waived any conflict are serious breaches of ethical conduct, we find they are subsumed in the most serious allegation against Respondent: knowing conversion of client property, which calls for disbarment.

rants disbarment even when the lawyer has no disciplinary history, has cooperated in the investigation, and is making restitution).

Here, the clear and convincing evidence demonstrates Respondent knowingly converted funds as charged in the complaint and engaged in a pattern of neglect in client matters and caused serious injury to her clients. Generally, these rule violations would call for disbarment and suspension, respectively.

However, the presumption of disbarment under the ABA *Standards* does not always apply. Each case is unique and calls for an analysis based upon more than the presumption alone. The Colorado Supreme Court has cautioned Hearing Boards to carefully weigh any mitigating factors that might overcome what might otherwise be the presumed sanction of disbarment. *In re Fischer,* 89 P.3d 817 (Colo.2004).

Unlike *Fischer,* Respondent has not genuinely acknowledged responsibility for her ethical violations, a factor the Colorado Supreme Court found to be the "foremost" among the numerous mitigating factors warranting a suspension of a year and a day rather than disbarment. Furthermore, Respondent failed to participate in these proceedings.

The evidence in these proceedings conclusively demonstrates that Respondent converted client funds by keeping them after failing to perform services and account for them. The Hearing Board is somewhat troubled by the possibility that the appropriate sanction here may be less than disbarment given the fact Respondent has been transferred to disability inactive status. Nevertheless, the Hearing Board cannot speculate on these issues and must therefore decide the case on the available evidence.

## VI. *CONCLUSION*

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. The clear and convincing facts reveal Re-

spondent violated Colo. RPC 8.4(c) when she knowingly converted funds belonging to her clients. The Hearing Board also found she violated Colo. RPC 1.3, 1.4(a), 1.7(a), and 1.16(d) while she represented her clients. Respondent therefore violated duties owed to her clients, the public, and the legal profession.

Absent extraordinary factors in mitigation not presented here, the ABA *Standards* and Colorado Supreme Court case law applying the ABA *Standards* both support disbarment for her most serious conduct of knowing conversion under the *Varallo* decision. *See also In re Thompson,* 991 P.2d 820, 823–24 (Colo. 1999). Upon consideration of the nature of Respondent's misconduct, her mental state, the significant harm and potential harm caused, and the absence of significant mitigating factors, the Hearing Board concludes there is no justification for a sanction short of disbarment.

## VII. *ORDER*

The Hearing Board therefore **ORDERS**:

1. **DEBRA ANN SWEETMAN**, Attorney Registration No. 15265, is hereby **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this order.

2. **DEBRA ANN SWEETMAN SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this order. Respondent shall have ten (10) days thereafter to submit a response.

3. **DEBRA ANN SWEETMAN**, as a condition precedent to any petition for reinstatement, **SHALL** pay full restitution to Mr. Gibson in the amount of $900.00, Ms. Boyce in the amount of $800.00, Ms. Dominguez in the amount of $600.00, and Ms. Southcotte in the amount of $1,899.00. Respondent **SHALL** reimburse the Attorney's Fund for Client Protection for any funds they provided to any of these clients.